May it please the Court, Loretta Berry for the United States. In this case, Freeman filed a motion to suppress evidence from a roving Border Patrol stop on Farm-to-Market Road 20-50. It has been featured in this Court's opinions from 1991 to 2014 as a notorious smuggling route used to circumvent the nearby checkpoints. Now, the District Court tasked the Magistrate Judge with conducting an evidentiary hearing with live testimony from the Border Patrol Agent Perez and from the alien passenger, after which the Magistrate Judge issued a report and recommendation faithful to the United States Supreme Court's Brignone-Ponce test and analyzing the totality of the circumstances to determine that reasonable suspicion supported the stop. The District Court rejected the Magistrate Judge's determination in an order that highlighted the Agent's statement that Border Patrol pulls over all cars that turn down Farm-to-Market Road 20-50. Now, generally on appeal of suppression rulings, this Court reviews the evidence in the light most favorable to the prevailing party, with legal determinations reviewed de novo and factual determinations reviewed for clear error. However, in Two Saint, which was a government appeal from an adverse suppression ruling, this Court recognized an exception. When the District Court employs the wrong legal test or when the Court misapplies the correct legal test, and in those circumstances, everything, the facts, the law, everything is reviewed de novo. And in this case, de novo review is proper here because on the face of the Court's order, at pages 135 and 136 of the record, no doubt the Court correctly recited the totality of the circumstances standard, but the Court highlighted the Agent's subjective statement and gave no other explanation for why all the other totality of the circumstances factors were rejected. The Supreme Court and the Fifth Circuit make absolutely clear that an officer's subjective intentions and reasons for a stop play no role in the reasonable suspicion or probable cause analysis because those are objective tests. That was in Wren, in this Court's holding in Lopez Moreno, and particularly in Melendez-Gonzalez, which I think is a very important case that's similar to this case. There was a roving Border Patrol stop, and the Agent testified, we stop all vehicles that trip the sensor. The Court held, though, that the way the Court analyzed it was that reasonableness depends upon not the subjective intent or the subjective reasons of the officer, but rather the Court must look at all the objective factors to decide whether reasonableness exists. Now in that case, though, the Court found there was no reasonableness because the stop failed the proximity test. It was over the benchmark. There was very little lead load evidence, which is something that the government had Another factor was the very slim evidence of the officer's experience, which was only four years. It was never developed. And to the extent that the Court agreed with Freeman's analysis of the totality of the circumstances, his analysis is flawed. At pages 36, footnote 5 of our brief, we highlighted that in Freeman's objections to the RNR, he evaluated each individual Brignone-Ponce factor in isolation, technically dissecting each factor, which the Supreme Court has precluded in our visa court test. The District Court seemed to not credit the magistrate judge in a sense with regard to the testimony of the arresting officer, and he did some kind of calculation that the speed I'm not sure I followed that, but in essence it was that it couldn't have given the speed at which you would have had to go to recapture it. He didn't think that was probable. Can you walk me through that? Yes, absolutely. I'm sure I understand. Absolutely, Your Honor. One thing that's important to note, first off, is that in Toussaint, this Court recognized that when the Court applies the wrong legal test, it infects the facts. And here is a perfect example of that. As to the one factor that goes to credibility, which is speeding, at Record 710, the agent testified that he believed Freeman was speeding because the agent drove over 100 miles an hour for approximately three to five minutes to just get a visual on Freeman. And he believed he was speeding because he also saw him weaving and dust being picked up. Now, here's how Toussaint kicks in. In that case, the District Court criticized the urgency of the response and criticized and doubted whether an emergency existed. So, too, did the Court in this case, in a remark that the Court made after the suppression ruling, the Court stated the math didn't add up to speeding. Well, in fact, the math adds up perfectly because he stated he was traveling 100 miles an hour, if the Court divides that by 12, which is five minutes times 12 equals 60 miles an hour, it comes out to 8.3 miles. And it's undisputed in the record that the stop occurred a little over 8.3 miles. That was admitted into evidence as an exhibit of a GPS picture of the stop. But importantly, as to the magistrate's credibility determination, as to only that single fact, deference is owed to the magistrate judge who conducted the live hearing, who saw and heard the testimony. That's what the Supreme Court has said in Arvizu, and we cited that in our brief, that the court, the magistrate judge, had superior access to the testimony as to that one fact. Now, the takeaway of the 28 days that we cited, in those cases, the District Court's reversal of the magistrate judge, this court sent it back, the appellate court sent it back, reversed it for a full credibility hearing. That's not necessary in this case because this is just one factor of credibility. The entire case doesn't turn on credibility as those did. There are other factors in this case that were suspicious. The suspicious registration. The agent testified that the truck looked like a work truck, but it wasn't registered to any of the businesses on 20-50. It was registered out of Houston. Was it a paper license plate? Yes, Your Honor. And in his experience, he testified that a paper license plate in and of itself is not suspicious. But when he coupled that with his eight years' experience and knowledge that eight years' experience, particularly on that 24-mile stretch of road where he knew that only a dozen homeowners were on that road, and he didn't recognize the truck as belonging to one of those, when the registration comes back from Houston, he knows that Freeman's on the stretch of road that is an indirect route to Houston, and in fact adds a whole hour to the trip that was under this court's holding in Delgado, which is also a case that was involving Farm and Market Road 20-50. Was the District Court free to conduct a de novo review, though? Yes, he was. On the magistrate judge's recommendation? Yes, he was. Absolutely, he was. And the court stated, and the District Court in her very short order stated that she had considered all the circumstances, recited the correct standard of review, but in fact, either the District, the only court, the only statement that the court relied upon was, and discussed actually, was the agent's subjective intent, which is prohibited by Wren and by her order, she states that she adopted the report and recommendation, or she adopted the objections of Freeman, which when we go and look at those objections in the record, those objections are all viewed in isolation. Each single one, each single, excuse me, each single factor is viewed in isolation, and therefore, the analysis is flawed. For the court to have adopted Freeman's analysis would have been violating the Supreme Court's holding in Arvizu and Portez that you cannot technically dissect each of the individual factors. Finally, as the agent's experience under Arvizu and Portez, there's substantial deference owed to this agent. He's worked at this particular spot, this rural location, for eight years. He understands that turning right directly in front of the checkpoint avoids the checkpoint. He's aware of the high-density smuggling in the area, and he's so attuned to the events that happened on Farmer Market Road 2050 that he knows there's about a dozen residents, he knows there are cars, he understands the paper license plate is suspicious, given all that he knows. Freeman makes much of his success rate in his brief, pointing out that there's only been one or two successful interdictions by this particular agent in his eight years experience during approximately 20 to 30 stops. The response to that is that the reasonable suspicion test is not a quantitative test. It does not deal with absolute certainties. So viewed under the De Novo standard of review, which is the proper standard here under Susaint, the objective facts in this case support reasonable suspicion under the totality of the circumstances. If there are no further questions, I reserve time for rebuttal. Yes, you've saved time for rebuttal. Thank you, Ms. Berry. Mr. Paras? Thank you. Good morning. May it please the court, I'm here representing Mr. Freeman from the Federal Public Defender's Office out of Houston. The district court did not misapply the legal test, and the district court did not make legal errors. What about reliance on the subjective view of the officer under the Wren case? The government does not, the court did not make an error in that case, in this case, a Wren error in this case. What the court did was the court discounted the weight to be given, the reason for following Mr. Freeman, because in this case, the agent testified that they follow everyone that turns on to 2050 from Highway 59. In Wren, the litigants conceded that there was probable cause. What they were litigating was whether or not the subjective intent of the officer that led him to follow the person and establish probable cause could do away with the probable cause, and the Supreme Court said no. If there is a legal basis for stopping an individual, then it doesn't matter what the officer was thinking. In this case, there was no legal basis for stopping Mr. Freeman. The correct standard is the Brioni-Ponce standard and not the Martinez-Fuerte standard, as the government has suggested. Well, you have a circuitous route, and as pointed out, the officer knows the vehicles that frequent the area, whether they're oilfield ranch trucks or belonging to the nearby residents. So, why isn't it suspicious that some unknown vehicle with paper license plate takes that road, which is, again, way out of the way to Houston? First, Your Honor, we're talking about a public farm-to-market road in Texas. We're not talking about a dirt road, a private ranch road, which are referenced in a number of opinions where the type of road is important. Secondly, Mr. Freeman was driving a white pickup truck. I think that there would be lots of Texans who would argue that it would be, that it's not suspicious to be driving a white pickup truck in Texas, and the agent didn't. You're probably suspicious if you're not. I agree, particularly with the headache rack on the back, as Mr. Freeman had in this case. However, there was nothing about what was observed regarding the truck that leads to the suspicion of criminal activity. A white pickup truck driven by an individual and registered to an individual is the reason that Agent Perez claims he was suspicious, because on this road it's mostly companies and ranchers. This is a road that links two big cities in Texas, well, not big, I guess, Bruny and Freer. It is 50 miles outside of Laredo. It's a road that the evidence says Border Patrol stops people driving down that road 20 to 30 times a day. So there was nothing suspicious about a white pickup truck and the temporary plates. If you look at Record 756, the agent testified that it made no difference to him that the plates were temporary plates. What mattered to him was that when he asked for the information back on the plates, they came back to an individual, not to a company. None of those facts, accepting those facts, leads to suspicion of criminal activity. I don't want to wait too long to get to the issue of speed. What the district court found was that it was physically impossible for Mr. Freeman to have been speeding based on the objective facts in the record. And the objective facts that the district court was talking about was the audio recording of the dispatch record. You can go to the magistrate's findings. What did the officer testify to who guarded his speeding? What he testified to, Your Honor, was that he had to travel five miles at speeds upwards of 100 miles per hour to catch up to Mr. Freeman. And that when he caught up to Mr. Freeman, Mr. Freeman was traveling about 70 miles an hour. He did not testify that he ever went. There was no evidence about what the speed limit was on that road. In our briefing, we submitted that under Texas law, the presumptive speed limit is 70 miles per hour on a numbered road. That's in the defendant's briefing. But the evidence is that Mr. Freeman was driving 50 miles an hour. In the magistrate's report and recommendation at Record 111, the magistrate, not the district into the dispatch recording. Agent Pett is radioed to stop about two miles south of Mills Bennett Road, which is approximately eight miles south of the checkpoint. Doing a simple math calculation. If you travel for nine minutes and 25 seconds and go eight miles, your average speed is 50 miles per hour. Couple that with other evidence in the record. There was a stop in October of 2016, which magistrate suppress that evidence as well. That's not on appeal. That testimony is in the record. It's a deputy Pettis and Deputy Pettis had a dash cam working. Deputy Pettis's dash cam records Mr. Freeman driving on the same road over the same distance at 49, 50, 49, 48 miles an hour. So that consistency. Somebody driving a white pickup in Texas, 49 miles an hour and a speed limit of 70. I'd be suspicious of that. That's a good point, Your Honor. But if you go both ways, you know, if you look at what was happening on this road at that time and you have to go to the deputy's testimony, there was construction. There were no markings on the sides of the road. It was marked solely by temporary pylons. And so I don't think that in this case you could give that the weight that you're suggesting. So the latest argument regarding credibility, when you look to the record, it's clear that the district court was correct when she concluded that the math did not add up and therefore the driving facts did not support reasonable suspicion. Tell me a little bit about what the district judge did in review of the magistrate's decision. I got the impression in the briefing that the district court first looked at the case and then later in some other context made statements about the case. I'm not clear about what happened. The district court reviewed the audio recording of the hearing before issuing its written order, three-page written order. Subsequent to suppressing the evidence, there was a hearing on whether the material witness should be deposed or released or whether there was case law that would support the court going to trial to reach, I guess, a tentative verdict. At that hearing is where the district court made additional comments regarding her previous order suppressing the evidence. But that order wasn't before them at the time. I don't understand the context in which you'd go back and revisit an issue not before them. Correct. The order was not, they were not there at the hearing to discuss the order. But during the discussion of whether they should release the material witness or not, the issue came up. And that's where the district court clarifies the math does not add up. The other Brioni-Ponce factors that the court analyzed and stated that she analyzed by discussing that she adopted the defendant's analysis was the proximity to the border. And in this case, the testimony is that Mr. Freeman was first noticed by Border Patrol as he approached the intersection to 2050 and took a right onto 2050. When he did that, the testimony reflects that that point is approximately 50 miles from the border. I don't think this court has ever held that the 50-mile line is a bright line and that standing on one side of the line indicates that the factor has been met and standing on the other side of the line indicates that the factor has not been met. Yeah, to the contrary, we've upheld stops that were several hundred miles away. Correct. Even in Louisiana. Correct. And in a lot of those cases, in that case, the court found that the proximity factor was not met but found other significant factors that did support reasonable suspicion. Here, we're talking about not West Texas, where you can drive for hundreds of miles from the border and not run into much but cactus and lizards, but we're talking about a town placed 50 miles outside of Laredo, a town of 230,000 people. The route that Mr. Freeman was driving on 59 not only connects Houston, it connects Victoria, and you can take the route to get to Corpus as well. So the proximity to the border, the district court reasoned, was not so clear in favor of the government and at most was a push. There's no evidence Mr. Freeman ever came from the border. The government did not introduce any evidence that he crossed the border or that any of their surveillance equipment. If he made a right turn on the highway, what direction would that be coming from? South? He started, yes, the road goes south. He wasn't coming from the border, but I guess he was about to be coming from the south. He would have been driving northeast and on making that turn be going south. The characteristics of the area, no one is disputing that this road, FM 2050, is a road where Border Patrol and other agents have stopped narcotic trafficking and smuggling. At the same time, there's testimony, sufficient testimony, that the road handles a lot of legitimate traffic. The usual traffic patterns, this happened at 4 p.m. in the afternoon, not at 2 a.m., not at 4 a.m., not during shift change. There's nothing unusual about the traffic patterns. The agent's experience in detecting illegal activity. It is the detection of illegal activity that makes an agent's experience important and weighty in this analysis. Here the agent had a 90 percent error rate. He testified that in his eight years working in this area at this station, he had made 20 to 30 stops based on reasonable suspicion, and he was correct in only two or three of those stops. That doesn't mean he didn't have reasonable suspicion in the other cases, but it does mean that his experience does very little to help him detect illegal or criminal activity. And in fact, that means that 80, 90 percent of the people lawfully driving on this public road have their lives stopped. Their potential jeopardy put in place, their passengers searched or questioned definitely, because they turn on to FM-2050. The driver's behavior. The agent testified that Mr. Freeman was glancing into his rearview mirrors, and the agent perceived that to be nervous activity. The testimony in the record shows that agent Perez came up on Mr. Freeman driving 100 miles per hour. Took him five minutes to go eight miles. Anybody who doesn't look in their rearview mirror at someone coming up behind him at that speed is not driving safely. Aspects or characteristics of the vehicle. It's instructive here to look at the other cases on 20-50. Those cases included a welding truck that did not have welding equipment. Trucks that had payload where there were reports and tips that the payloads contained contraband. The aspects of the vehicle do not support reasonable suspicion. And lastly, the government concedes and put no evidence in the record that there had been any recent trafficking of narcotics or aliens on this road, nor that the agent actually saw a passenger in the truck. The Buoni-Pons factors do not add up to reasonable suspicion in this case. The district court's decision should be affirmed and the evidence suppressed. Thank you. All right. Thank you, Mr. Perez. Ms. Berry, you say time for rebuttal. Does it seem strange to get to go last? Doesn't happen very often. It really doesn't. This is my first time, frankly, Your Honor. I want to point out for the court, first of all, with respect to the speed, it's really important that the court understand that the facts that Mr. Perez was speaking about, about the deputy's testimony and the pylons and the dash cam, all of those facts are completely irrelevant to this case because those facts dealt with the October stop, which the government is not appealing. The facts here are the February stop. Those are completely irrelevant, what he was speaking about. I urge the court to look at that and make sure that the court is looking at the February stop. As to the proximity factor, this court held in Jaquino very clearly that when a vehicle is first spotted within that 50-mile benchmark, that satisfies the proximity test. And in this case, at record 697, it is undisputed that he was first spotted at the checkpoint, which is approximately 50 miles of the border. Some of our previous cases raised some doubt about whether this particular farm-to-market road is within 50 miles. There's some equivocation about that, isn't there? Well, the only equivocation, there were four cases that were issued in approximately a 23-year span, Your Honor, and the only one out of the three that had some doubt about it was Delgado, and that was because there was absolutely no evidence introduced at all in the record about 2050. Here we have evidence from the agent, and also in Delgado, Reno, which was an en banc case from this court, the court recognized that 2050 satisfies the proximity factor. But again, as I noted, even if the court— I don't know which course to take. That's a fact, a physical fact that the course can take notes as well. Yes, Your Honor. Yes, Your Honor. Google it. Yes. Yes, Your Honor. I believe it's Nichols that says that Googling the precise location is sufficient. But the court doesn't even need to go that far, because in Jacquinot, this court held that even if the ultimate stop exceeds the benchmark, if the vehicle is first stopped within the 50-mile radius, that satisfies proximity, which is a very important factor. This court has called it a paramount factor, even though it's not all controlling. As to the other factors, Mr. Paras noted that the truck had no distinguishing features, but this court has recognized time and time again that not every single factor in Brognoni-Ponce must be satisfied. It is a totality test under each individual fact. One point I'd like to make about— Mr. Paras alluded to the fact that the agent said he didn't place any reliance on the paper license plate. If that's so, does that mean we also should not place reliance on that? No, because that would be—this court would need to perform a de novo review, Your Honor. And I believe the testimony showed initially, yes, he did say, I don't place any reliance on a paper license plate. Further, after that, in the record, the magistrate judge asked some more detailed questions, and he clarified that a paper license plate in and of itself is not suspicious, but the fact that it was affixed to a truck that he did not recognize on a road that he had traveled for eight years, sometimes on a daily basis, that he knew that only 12 people, homeowners, lived on that road, that triggered in his mind that drug smugglers sometimes use paper plates for new cars to avoid being, I guess, recognized at the checkpoint, because sometimes the systems aren't updated as quickly as possible. You can't call in and get an accurate reading on it. That's correct, Your Honor. One point I would like to make about this notion that it was a Border Patrol policy to stop— What your answer to Judge Smith's question is, we can take it into account, even though it didn't matter to the officer. Is that what you're saying? I'm saying— We should take it into account. I'm saying all of it is de novo review, yes, Your Honor, that the court does take everything into account, but I think in this court's de novo review, you look at the entirety of the testimony, and the entirety of the testimony doesn't just stop with paper license plates don't mean anything. You have to look at the entire testimony, and later in his testimony, he clarifies why it did in this case. The question that initially— Well, I guess that's a matter of interpretation. You said later he clarified how it did. He got led into saying that would be my interpretation of what happened, but anyway, go ahead. One point I want to make about this notion that it's a policy that Border Patrol pulls all cars over, that was at Record 705. A few questions later at 707, the agent was asked, what is your protocol when you start following a vehicle? And the agent testifies, well, we check the vehicle registration. Why? Because it's uncommon for vehicles out of the area to be on that road. It's not a direct route. All right. Your time has expired. Thank you. That's all right. Thank you, Your Honor. Thank you. Your case is under submission.